UNITED STATES OF AMERICA,

           Plaintiff,

                                  Case No. 24-cr-28-pp

    v.

SHANNON WILDER,

           Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO REVIEW BOND (DKT. NO. 79)

On February 16, 2024, Magistrate Judge Stephen C. Dries ordered the defendant detained pending trial. Dkt. Nos. 59-60. On March 13, 2024, the defendant filed a Motion to Reopen the Court's Order of Detention and Motion to Consider Proffered Release Plan Pursuant to 18 U.S.C. §142, dkt. no. 69, which Judge Dries denied on March 20, 2024, dkt. no. 73. On May 6, 2024, the defendant filed a Motion to District Court to Reopen the Magistrate Judge's Order of Detention and Denial of the Defendant's Motion to Reopen and Consider Proffered Release Plan Pursuant to 18 U.S.C. §3142, which is now fully briefed. Dkt. No. 79.

After conducting a *de novo* review of the record and the parties' arguments, the court concludes that the defendant has rebutted the two presumptions of detention but that the government has satisfied its burden to prove by clear and convincing evidence that the defendant poses a danger to the community and that there is no condition or combination of conditions that will assure the safety of others or the community. The court will deny the defendant's motion for bond.

## I. Background

On February 2, 2024, the government filed a complaint alleging that the defendant and eight others had committed various drug offenses. Dkt. No. 1. The same day, the court issued arrest warrants for all the defendants.

On February 7, 2024, law enforcement coordinated to arrest the alleged DTO (drug trafficking organization) members and search their residences. Dkt. No. 83 at 3. During searches at several residences, "case agents located nearly $75,000 in cash, hundreds of grams of fentanyl and cocaine, multiple firearms and a machinegun conversion device (switch)." Id. Law enforcement arrested the defendant in a rental property at 3533 North 60th Street in Milwaukee. Dkt. Nos. 79 at 5, 83 at 12-13. After surveillance, the government concluded that this was the defendant's residence. Dkt. No. 83 at 13. According to the defendant, he "was residing off and on over the ten (10) months prior to his arrest" at this address, which his significant other (Deasia Smith) rented. Dkt. No. 85 at 2. At the time of the arrest, law enforcement located a ballistic vest; a loaded black/blue Glock 45, 9mm, with a gold slide and laser sight; a loaded black/blue Glock 43X, 9mm; a Glock machinegun conversion device (switch); a large chain with a diamond encrusted "3278" pendant; a Rolex watch with a red face and $5,000 cash. Dkt. No. 83 at 3. Law enforcement also found various documents in the defendant's name, including an appraisal for a "customized Rolex" watch valued at $16,000; the defendant's wallet with his driver's license, Social Security card and other cards; a vehicle agreement; and other assorted identifiers for the defendant. Id. at 13.

Judge Dries ordered the defendant temporarily detained and scheduled a detention hearing. Dkt. No. 16. Before the detention hearing, Pretrial Services prepared a bond study. Dkt. No. 26. The report reflected that the defendant

2

was thirty-four years old and had been born and raised in Milwaukee. Id. at 1. The defendant told Pretrial Services that he has "great relationships" with his parents who live in Milwaukee and that he has fifteen siblings, including two of his codefendants. Id. He reported that he had been in a relationship with Deasia Smith for almost two years and that for ten months he had been living at the North 60th Street address with her and her children. Id. The defendant explained that he and Smith do not have any children together, but that he has four children from two previous relationships. Id. The defendant reported earning his GED while incarcerated, but no other education. Id. at 2. He said that he "does not hold formal employment, but he helps his sister with her two businesses . . . a salon and a phone store." Id. The defendant denied any current or past mental health condition but did describe a history of substance use starting at the age of seventeen. Id. at 3. The defendant reported that he had completed substance abuse treatment while incarcerated and that he would be interested in attending again. Id.

The bond study recounted the defendant's prior criminal record. Id. at 3-5. It reflected arrests dating back to 2001, when the defendant was eleven years old. Id. at 3. The defendant had been arrested for false imprisonment, disorderly conduct, fleeing an officer, possession of a firearm as a prohibited person and various controlled substance offenses. Id. Many of these arrests had not resulted in convictions, but the defendant had been convicted of one count of misdemeanor disorderly conduct (2010), one count of misdemeanor battery (2010), one count of misdemeanor possession of cocaine (2010), one count of felony possession with intent—cocaine (2014), one count of misdemeanor operating while revoked (2017), one count of felony

3

fleeing/eluding an officer (2018) and one count of misdemeanor obstructing an officer (2019). Id. at 4-5.

Pretrial Services concluded that "[t]here are no known factors indicating the defendant poses a risk of nonappearance" but that the defendant posed a risk of danger to the community because of the nature of the instant offense, the defendant's prior arrests and convictions, his substance abuse history and his involvement in a criminal association. Dkt. No. 26 at 5. Nonetheless, Pretrial Services recommended that Judge Dries release the defendant on the following conditions:

1.    The defendant shall report to Pretrial Services as directed.

2.    Have no contact with co-defendants, witnesses or victims of the alleged instant offense.

3.    The defendant is not to possess any firearms or other dangerous weapons.

4.    Refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. 802, unless prescribed by a licensed medical practitioner.

5.    The defendant shall maintain participate in a program of testing for drug and alcohol abuse as approved by the Pretrial Services Officer. The defendant shall pay costs as directed by Pretrial Services.

6.    If deemed appropriate by the Pretrial Services Officer, the defendant shall also participate in residential or outpatient drug treatment. The defendant shall pay the cost of this program as directed by Pretrial Services.

Id.

On February 16, 2024, Judge Dries presided over the detention hearing, at which the government sought detention.[1] Dkt. No. 59. Over the defendant's objection, Judge Dries ordered the defendant detained pending trial. Id. at 2.

---

[1] There is no transcript of the detention hearing, but the court reviewed the audio recording of the hearing.

4

He observed that the defendant faced multiple charges involving firearms and drugs (including fentanyl), that the weight of the evidence against the defendant was strong and that the defendant was subject to two presumptions of detention. Id. Although Judge Dries characterized the defendant's criminal history as light, he opined that the defendant had no significant work history. Id. Judge Dries issued a written order of detention, which specified that the defendant was subject to two rebuttable presumptions under 18 U.S.C. §3142(e)(3). Dkt No. 60 at 2. Judge Dries explained that the presumptions applied because the defendant had been charged with a drug trafficking offense that carried a maximum term of imprisonment of ten years and with a violation of 18 U.S.C. §924(c). Id. The written detention order stated, "The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis." Id.

On February 13, 2024, the grand jury returned a thirty-two-count indictment charging the defendant and nine others with various offenses related to their alleged participation in the drug trafficking organization. Dkt. No. 42. The grand jury charged the defendant with six counts: (1) conspiracy to distribute and conspiracy of possession with the intent to distribute, in violation of 21 U.S.C. §§841(a)(1), 841(b)(1)(A), 841(b)(1)(B) and 846; (2) use of a communication facility in furtherance of a drug trafficking offense, in violation of 21 U.S.C. §843(b); (3) distribution a controlled substance, in violation of 21 U.S.C. §§841(a)(1), (b)(1)(C); (4) possession of a machinegun, in violation of 18 U.S.C. §§922(o) and 924(a)(2); (5) possession of a firearm in furtherance of a drug trafficking offense, in violation of 21 U.S.C. §924(c); and (6) being a prohibited person in possession of a firearm, in violation of 18 U.S.C. §922(g)(1). Id. at 1-3, 12, 18-20.

5

On March 13, 2024, the defendant filed a motion to reopen the order of detention and to consider a proffered release plan. Dkt. No. 69. The defendant asserted that during the detention hearing, the government had attributed to him a 2018 arrest involving possession of seven firearms, but that it was the defendant's father—Shannon Wilder, *Sr.*—and not the defendant who'd been arrested. Id. at 2. The defendant also asserted that his uncle, Joe Wilder, would be able to serve as a third-party custodian in the event of his release. Id. at 3-4. The government opposed reopening the detention hearing. Dkt. No. 72. Although the government conceded that the 2018 arrest had not involved the defendant, it argued that "the July 4, 2018 search warrant was a minor point in the government's overall argument in favor of detention" and that "this information was immaterial given Defendant's [] own significant criminal history and the other factors in this case." Id. at 6. The government detailed the defendant's "extensive criminal history and poor performance on supervision," before asserting that his "adult criminal history includes numerous instances of failure to comply with police orders, violation of bail conditions, probation revocation, and even failure to appear to serve a jail sentence." Id. at 6-10. The government contended that the defendant's release plan (in which he proposed to live with his uncle at 3234 North Palmer Street) did "not inspire confidence." Id. at 10. The government observed that the defendant's motion had not provided enough information for the government to identify the defendant's uncle, but it stated that it had found a person named "Josiphus Wilder" who matched many of the details the defendant had provided about his uncle. Id. The government asserted that "Josiphus Wilder" has multiple drug trafficking convictions and that he posted a property bond in one of his cases by listing "3234 N. Palmer Street". Id. at 11. The government claimed that, even if

6

"Josiphus Wilder" is not the defendant's uncle, the defendant had listed 3234 N. Palmer Street as *his* address since 2008 and that the defendant's criminal record shows that he lived at this address when he committed criminal offenses. Id. at 10-12.

On March 20, 2024, Judge Dries denied the defendant's motion to reopen. Dkt. No. 73. He observed that a detention hearing may be reopened if new information comes to light, but that generally the question of bond is addressed exclusively at the defendant's single detention hearing. Id. at 1 (citing 18 U.S.C. §3142(f)). Applying this standard, Judge Dries explained:

> Although the information about the mix-up between the defendant and his father is new information to *counsel*, it very likely could have been explored at the original hearing. Similarly, the possible assistance of a third-party custodian is not "new" information that warrants reopening the hearing, if only because defendants could serially propose a revolving door of individuals who might be called upon to serve in that capacity. In short, information that the defendant himself generates or arranges does not qualify. Accordingly, it would be improper to reexamine bond based on the information provided by the defendant's motion.

Id. at 2 (emphasis in original). Judge Dries determined that "[e]ven if the additional information provided in the motion qualified as new, the matters now raised do not suffice to materially mitigate any risk to the community's safety." Id. Judge Dries summarized the relevant evidence regarding the safety of the community:

> The defendant was charged with six counts relating to a wide-ranging drug conspiracy and had been engaged in controlled sales of fentanyl, the most toxic drug in modern times. These charges were substantial and gave rise to two presumptions of detention. A search revealed illegal guns, including a machine gun, and substantial cash. Although I noted that the defendant had a "light criminal history," ECF No. 59, he also lacked a significant work history. The defendant also observed that I had earlier ordered the release of a co-defendant named Hampton, but I rejected that comparison because Hampton had no prior felony, no illegal possession of

7

firearms, no machine gun, and he played a lesser role in the criminal conduct alleged. Id.

Id. He concluded that "the seriousness of the offense and the apparent strength of the evidence counseled strongly in favor of detention, a finding that is not disturbed by the information now supplied in the motion to reopen." Id.

On May 6, 2024, the defendant filed a motion asking this court to review his bond. Dkt. No. 79.

## II.    The Parties' Arguments

The defendant argues that the court should release him with conditions because there are facts under §3142(g) that both rebut the presumption(s) of detention and demonstrate that there are conditions of release that will reasonably assure his appearance in court and the safety of any person and the community. Dkt. No. 79 at 2. He contends that the presumptions of detention impose a light burden of production on a defendant that can be "rebutted by '*[a]ny evidence* favorable to a defendant that comes within a category listed in §3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community and other types of evidence encompassed in §3142(g)(3).'" Id. at 3-4 (quoting U.S v. Dominguez, 783 F.2d. 702, 707 (7th Cir. 1986)) (emphasis in original). The defendant asserts that "[a] judge may not detain a defendant in a presumption case based solely on (1) an unrebutted presumption alone, (2) evidence of a defendant's past dangerousness, (3) the nature and seriousness of the crime charged, or (4) the weight of the evidence of the person's guilt." Id. at 6. The defendant asserts he has rebutted the presumptions. Id. at 7-8. He maintains that he has strong community ties as a lifelong resident of Milwaukee, with substantial family ties in the area and consistent employment. Id. The defendant notes "[h]e has been in a relationship with Deasia Smith for two years now and had been residing

8

with her and her children for ten (10) months." Id. at 7. The defendant denies that he has a history of missing court dates. Id. at 8. He avers that he has "a *stale* criminal history, having been last convicted of a crime in 2018, a misdemeanor obstructing an officer of which he received a fine and credit for time served[.]" Id. (citing Dkt. Nos. 26, 69, 73) (emphasis in original). Based on these factors, the defendant concludes that he had rebutted the presumptions. Id. at 7-8.

The defendant argues that the government has not satisfied its burden of proving there are no release conditions that will reasonably assure the safety of the community and/or the defendant's appearance in court. Id. at 8. He contends that the following release conditions could reasonably assure those things:

1.     Place [the defendant] in custody of a third-party "who agrees to assume supervision and to report any violation of a release condition to the Court" [§3142(c)(1)(B)(i). Proffered in the motion to reopen, [the defendant's] uncle, Joe Wilder, would serve as an appropriate third-party. Other potential third-party custodians are available and include friends and family members including:

Rhonda McKinney, 7964 North 107th Street, Unit #3, Milwaukee, WI 53224

Linda Love, 3230 North 33rd Street, Milwaukee, WI 53216

Shykela Holder, 6330 West Florist Ave., Milwaukee, WI 53218

All of these individuals were not known to be able to serve in this capacity as third-party custodians at the time of the detention hearing.

2.     Maintain and/or seek employment ([the defendant] currently has employment that he can return to). ECF 59

3.     Follow restrictions on personal associations, place of residence, and travel including GPS, electronic monitoring and 24-hour home confinement except for work, child care; this can include a half-way house if deemed necessary.

4.     Report to PTS as required.

9

5.      Abide by all rules of PTS, including outpatient or inpatient treatment for substance abuse.

6.      Post a monetary bond and/or property of a sufficient unencumbered value.

7.      Any other condition that is reasonably necessary to assure the appearance of [the defendant] as required and to assure the safety of any other person and the community.

Id. at 9-10. "Based upon the above release plan/proffer," the defendant asks the court to "release him upon all of the terms and conditions outlined above as well as any additional terms and conditions the Court feels are necessary and appropriate[.]" Id. at 10-11.

The government responds that it "remains convinced that the defendant should be detained, given the two operative presumptions, the evidence, and the weight of the controlling Section 3142(g) factors." Dkt. No. 83 at 1. It observes that "Magistrate Judge Dries properly determined that there are two presumptions of detention for [the defendant] and [the defendant] does not contest that finding." Id. at 8. The government contends that the Seventh Circuit has held that evidence similar to that presented at the detention hearing is sufficient to support detention based on the presumption. Id. at 9. (citing United States v. Portes, 786 F.3d 758, 764-65 (7th Cir. 1985)). The government avers that the defendant has not met his burden of production and thus not rebutted the presumption. Id. at 9-10. It argues that even if the court finds that the defendant did rebut the presumption, the presumption "'remains in the case as an evidentiary finding militating against release, to be weighted along with other evidence relevant to factors listed in § 3142(g).'" Id. (quoting Portes, 786 F.2d at 764). "Thus," the government concludes "even if the presumption were rebutted, analysis of the statutory factors mandates detention." Id. at 10.

10

The government argues that "[the defendant] poses a significant danger to the community" and that "every factor under 18 U.S.C. § 3142(g) supports continued detention pending trial."[2] Id. at 6, 10. Starting with the nature and circumstances of the offense, the government contends that "the evidence uncovered a sophisticated operation involving multiple individuals, over a dozen controlled buys, nine residential search warrants during which significant amounts of drugs, currency, and weapons were found at DTO members' residences, including the firearms and machine gun found at [the defendant]'s residence." Id. at 10. Quoting United States v. Dominguez, 629 F. Supp. 701, 710 (N.D. Ind. 1986), the government explains that "'a judicial officer must be careful, in drug offenses, to discriminate between isolated or street level transactions and major drug distribution schemes'" and that "'[t]he level of the danger to the community increases proportionately with the increase in the sophistication, nature, size, and extent of the drug operation.'" Id. at 11.

Turning to the weight of the evidence, the government states that the defendant "sold fentanyl to an undercover agent, on video." Id. at 12. It asserts that the court should reject any attempt by the defendant to distance himself from the DTO because law enforcement set up the controlled buy for "approximately 500 doses of fentanyl" by "calling one of the main shared DTO drug telephone numbers[.]" Id. at 8, 12. While it concedes that law enforcement did not find drugs in the defendant's residence on February 7, 2024, the government says that "case agents did locate drugs in other DTO members' residences and given the nature of a drug distribution organization and drug-

_____

[2] The government's motion does not assert that the §3142(g) factors demonstrate that the defendant is flight risk, only that the defendant is a danger to the community.

trafficking conspiracies, it is not uncommon for drugs to be stored in one location, profits in another, and weapons in another."[3] Id. at 12. The government also asserts that the defendant "poses a significant danger to the public," in part, because "[d]rug trafficking is an inherently dangerous activity" based both on "the effect the substances themselves have on users and because a criminal enterprise such as the one defendant finds himself involved [sic] often precipitates illegal possession of firearms and violence." Id. at 13. The government maintains that the defendant poses a danger to the community because he "directly distributed fentanyl[,]" "conspired with others to distribute fentanyl," "possess[ed] multiple firearms, one of which had an extended magazine," and possessed "a machine gun conversion device." Id. Finally, the government describes the defendant's "extensive criminal history and poor performance on supervision." Id. at 16. The government asserts that the defendant's criminal history is not as stale as he claims because "his 2018 case was not resolved until 2019 and the present investigation into this DTO began in 2022." Id. at 18.

The defendant replies that he has overcome the operative presumptions and argues that the government has not satisfied its burden of persuasion regarding the §3142(g) factors. Dkt. No. 85. The defendant objects that he is not part of a "sophisticated operation" as the government claims, because he "is alleged to have engaged in one (1) controlled buy on October 6, 2023, and apparently no one (neither UC2 nor case agents) knew who he was at the time." Id. at 2 (citing Dkt. No. 42). The defendant continues:

---

[3] The government says that the defendant "is the only indicted DTO member found in possession of a switch/machine gun conversion device." Dkt. No. 83 at 12.

12

At the time of the search warrant, February 7, 2024, [the defendant] was residing off and on over the ten (10) months prior to his arrest at a residence at 3533 North 60th Street rented by his significant other, Deasia Smith. Criminal Complaint PPH #366 His primary address was still 3234 North Palmer Street which was verified by the Enterprise Rental Car agreement obtained by case agents. Criminal Complaint PPH#84 So, the firearms and alleged automatic 'switch' discovered during the search of 3533 North 60th Street address did not belong to [the defendant]. Nor were either of the firearms under his personal control. Further, there were no drugs found at this residence nor in [the defendant's] possession upon his arrest.

Id. at 2-3.

The defendant contends that he "is hardly an alleged leader of this operation, and is not alleged to have any contacts with drug suppliers[,]" and that "the plan proposed for his release would allay any concerns that the Court would have of his involvement in continuing any criminal enterprise." Id. at 3.

Turning to the weight of the evidence, the defendant contends that "the two firearms and the auto 'switch' found during the search of 3533 North 60th Street, a house rented by Ms. Smith as noted above, have no connection to [the defendant] and therefore the evidence is not particularly strong on Count(s) #17-#19." Id. Finally, the defendant reiterates his connections with the Milwaukee area and again emphasizes that his "last conviction was in 2018." Id. at 5-6. The defendant concludes that "[w]hether or not this Court grants an evidentiary hearing in this matter, [he] should be released on conditions that can assure safety in the community as well as assuage any risk of his nonappearance at future court proceedings." Id. at 6.

**III.   Analysis**

    A.   Standard of Review

Under 18 U.S.C. §3145(b), a defendant may move for the district court to review a magistrate judge's release or detention order. The district court must conduct a *de novo* review and need not defer to the magistrate judge's findings.

United States v. Wilks, 15 F.4th 842, 847 (7th Cir. 2021); see also United States v. Cross, Case No. 20-cr-9, 2020 WL 1139841, at *1 (E.D. Wis. March 9, 2020). The district court's review of a magistrate judge's detention order may be conducted either by reviewing the transcript or by holding a new hearing. United States v. Torres, 929 F.2d 291, 292 (7th Cir. 1991). Although the district court has the authority to conduct a new hearing, it is not required. See 18 U.S.C. §3142(f).

      B.    Burden of Proof

Under the Bail Reform Act of 1984, a defendant shall not be detained pre-trial unless the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §3142(e). The government bears the burden of proving flight risk by a preponderance of the evidence. Portes, 786 F.2d at 765. The government bears the burden of proving danger to others or the community by clear and convincing evidence. United States v. Salerno, 481 U.S. 739, 751 (1987). A finding of either flight risk or danger to the community is sufficient to detain a defendant awaiting trial; under the Act, a court need not find both to detain a defendant. United States v. Daniels, 772 F.2d 382, 383 (7th Cir. 1985). In determining whether a defendant is a risk of flight and/or a danger to the community, the court must consider (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves narcotics; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. §3142(g).

C.    Section 3142(e) Presumptions

Under the Bail Reform Act, if the judicial officer finds that there is probable cause to believe that the defendant committed one or more of a select list of offenses, there arises a rebuttable presumption that no condition or conditions will reasonably assure the appearance of the defendant and/or the safety of the community. 18 U.S.C. §3142(e)(3). Among these offenses are an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§801 et seq.) and an offense under 18 U.S.C. §924(c). 18 U.S.C. §3142(e)(3)(A), (B). Because the charge in Count One carries a mandatory minimum sentence of ten years and Count 19 charges the defendant with a violation of 18 U.S.C.§924(c), dkt. no. 42 at 1-2, 20, he faces two presumptions of detention.

The presumption "places a light burden of production on the defendant," Wilks, 15 F.4th at 846-47, and that burden is "not a heavy one to meet," Dominguez, 783 F.2d at 707. "Any evidence favorable to a defendant that comes within a category listed in §3142(g) can affect the operation of . . . the presumption[], including evidence of [a defendant's] marital, family and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in § 3142(g)(3)." Dominguez, 783 F.2d at 707. "[T]he burden of persuasion always rests with the government and an unrebutted presumption is not, by itself, an adequate reason to order detention." Wilks, 15 F.4th at 846-47. Even if the presumption is "rebutted," however, it "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." Dominguez, 783 F.2d at 707; see also Wilks, 15 F.4th at 847

15

(stating that "the presumption is considered together with the factors listed in § 3142(g)").

On *de novo* review, this court concludes that the defendant has met his "light burden of production" and rebutted the presumptions. As to risk of flight, the evidence shows that the defendant was born in Milwaukee and, at age thirty-four, has lived there his entire life. Dkt. No. 26 at 1. The defendant's parents, significant other, four biological children and most of his siblings (twelve out of fifteen) live in Milwaukee. Id. The defendant reports that he is close with his family and advises the court that "[h]is family was present at the detention hearing." Dkt. Nos. 26 at 1, 79 at 4 (citing Dkt. Nos. 59, 69). The defendant's limited employment history seemingly consists of jobs with family members, and he proposes to work with "his uncle's trucking company" if released. Dkt. Nos. 26 at 2, 79 at 7. This evidence demonstrates the defendant has significant ties to the community and is sufficient to meet the "light burden of production." Thus, the defendant has rebutted the presumption that he is a flight risk.

The defendant also has met the light burden of production rebutting the presumption that he is a danger to the community. Again, he needs only to produce some evidence relating to one of the §3142(g) factors. Judge Dries accurately described the defendant's criminal record as "light." Dkt. No. 73 at 2. In the fifteen years since he turned eighteen, the defendant has had only five convictions. Only two of these five convictions occurred within the last ten years. Dkt. No. 26 at 4. None of his convictions involved violent offenses. Over four and a half years passed between the defendant's last conviction—on January 9, 2019—and the controlled buy described by the government, which took place on October 6, 2023. This evidence is enough to overcome the "light

16

burden of production" necessary to rebut the presumption he is a danger to the community.

Although the court concludes that the defendant has met his light burden of production to rebut the presumptions, the presumptions still "remain[] in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in §3142(g)." Dominguez, 783 F.2d at 707; see also Wilks, 15 F.4th at 847 (stating that "the presumption is considered together with the factors listed in § 3142(g)").

    D.    Section 3142(g) Factors

The government has argued only that the defendant is a danger to the community, not that he is a flight risk. Dkt. No. 83 at 6. Because the government has not argued that the defendant is a flight risk and it is the government's burden to prove that he is, the court will not evaluate whether the §3142(g) factors support detaining the defendant based on risk of flight. The court considers only whether the §3142(g) factors support detaining the defendant based on danger to the community. See Daniels, 772 F.2d at 383 (holding that a finding of either flight risk or danger to the community is sufficient to detain a defendant awaiting trial).

        1.    *The Nature and Circumstances of the Offense Charged*

The grand jury charged the defendant and nine others in a thirty-two-count indictment alleging that they participated in a sophisticated DTO spanning a year and a half (from January 2022 through February 7, 2024, the date of the defendant's arrest). Dkt. No. 42. The indictment alleges that the conspiracy involved distribution of fentanyl, methamphetamine and cocaine. Id. at Count One. According to the government, law enforcement began investigating the organization in 2022 and engaged in "over a dozen controlled

17

buys[.]" Dkt. No. 83 at 10, 18. The DTO used shared drug telephone numbers; the government alleges that the defendant and at least four other DTO members used these shared numbers to conduct controlled buys. Id. at 12. The government asserts that the single fentanyl delivery referenced in the conspiracy count and in Count Eleven of the indictment "was set up by calling" one of those shared numbers. Id. at 3. It asserts that the twenty-five grams of fentanyl that the defendant personally delivered to an undercover agent on October 6, 2023 equaled some 500 doses. Id. at 8.

When law enforcement conducted a coordinated search of residences associated with the DTO, they discovered "nearly $75,000 in cash, hundreds of grams of fentanyl and cocaine, multiple firearms and a machinegun conversion device (switch)." Id. at 3. The defendant was arrested in a residence containing a ballistic vest; a loaded black/blue Glock 45, 9mm, with a gold slide and laser sight; a loaded black/blue Glock 43X, 9mm; a Glock machinegun conversion device (switch); a large chain with diamond encrusted "3278" pendant; a Rolex watch with red face and $5,000 cash. Id. The number of alleged members, types of drugs, presence of multiple firearms and the use of multiple shared customer phone numbers demonstrate that the alleged organization was somewhat sophisticated, and there is evidence showing that the defendant was involved in that organization.

The Seventh Circuit has cautioned that courts "must be careful, in drug offenses, to discriminate between isolated or street level transactions and major drug distribution schemes," because "[t]he level of the danger to the community increases proportionately with the increase in the sophistication, nature, size, and extent of the drug operation." Dominguez, 629 F. Supp. at 710. Considering that caution, the court acknowledges that the limited evidence

proffered by the government does not describe the DTO as the most sophisticated drug operation this court has seen. But the evidence relating solely to the defendant—the fact that after law enforcement used one of the DTO's shared telephone numbers to set up a purchase, the defendant appeared in person and personally sold 500 doses of fentanyl to an undercover agent and the fact that law enforcement arrested the defendant in a residence he admitted having inhabited that contained two loaded handguns and a switch— implies a major drug-distribution scheme, not an isolated or street-level transaction.

Although the defendant insists that he is only "alleged to have engaged in one (1) controlled buy on October 6, 2023, and apparently no one (neither UC2 nor case agents) knew who he was at the time," this characterization ignores the context surrounding the controlled buy. Dkt. No. 85 at 2. Again, the defendant showed up in person to sell an undercover agent 500 doses of fentanyl after law enforcement called one of the DTO's shared phone numbers. Even if law enforcement did not know that the defendant was involved with the DTO *before* this controlled buy, the circumstances surrounding this transaction support their subsequent conclusion that the defendant was associated with the DTO.

With regard to the firearms found in the search, the defendant has given inconsistent statements regarding the North 60th Street residence. First, the defendant told Pretrial Services that his girlfriend of two years, Ms. Smith, rented the home at 3533 North 60th Street and that "he ha[d] been living there with her and her children for ten months." Dkt. No. 26 at 1. In the defendant's motion asking the district court to review his request for release on bond, he claimed the residence at North 60th Street "was rented by his friend." Dkt. No.

79 at 5. In that same motion, he stated that "[h]e has been in a relationship with Deasia Smith for two years now and had been residing with her and her children for ten (10) months." Id. at 7. In his reply brief, the defendant says he "was residing off and on over the ten (10) months prior to his arrest at a residence at 3533 North 60th Street rented by his significant other, Deasia Smith[,]" and that "[h]is primary address was still 3234 North Palmer Street[.]" Dkt. No. 85 at 2.

It does not matter whether Ms. Smith rented the 3533 N. 60th Street residence, whether the defendant only lived there "off and on" or whether the defendant had a "primary residence" somewhere else. The fact remains that on February 7, 2024—two days before the bond study interview and within the ten-month period the defendant said he had been residing at the North 60th Street address—law enforcement found a bullet-proof vest, two loaded guns and a switch capable of converting a semi-automatic firearm into a fully-automatic firearm at that residence with the defendant. Law enforcement also found a diamond-encrusted pendant, a Rolex watch and $5,000—this despite the fact that the defendant reported to Pretrial Services that he did not have formal employment, worked only twenty or so hours a week helping his sister and received financial help from Ms. Smith. And the government explains that during periodic surveillance, law enforcement saw the rental vehicle that the defendant had used in the October 2023 controlled buy parked outside the residence; saw a truck rented by the defendant parked on the parking slab; and later saw a sedan registered to the defendant parked on the parking slab. Dkt. No. 83 at 13. In approximately the week prior to law enforcement obtaining a search warrant for the residence, surveillance agents saw the defendant enter and exit the residence, and the defendant was present in the

20

residence when agents executed the search warrant. Id. Agents also found identifying information for the defendant—an appraisal in his name for a Rolex, a wallet containing his driver's license and Social Security card and a vehicle agreement. Id.

The serious nature and circumstances of the offenses with which the defendant has been charged are reflected in the penalties he faces if convicted. Count One—the drug conspiracy count—carries a mandatory minimum sentence of either five or ten years, depending on the amount of drugs. Dkt. No. 59 at 1. The gun charge in Count Nineteen carries a mandatory minimum of five years in prison that must be served consecutively to any other sentence. Id.

The nature and circumstances of the offenses with which the defendant is charged weigh in favor of a conclusion that the defendant presents a danger to the community.

2. *The Weight of the Evidence Against the Person*

There is strong evidence to support the charge in Count Eleven (distribution of fentanyl on October 6, 2023). The evidence shows that the defendant sold an undercover agent 500 doses of fentanyl after law enforcement called the DTO's shared telephone number. Dkt. No. 83 at 8, 12. Law enforcement video recorded this controlled buy. Id. at 12. The defendant drove a rented vehicle, which law enforcement later observed parked outside the residence on North 60th Street. Id. at 13. Law enforcement observed the defendant enter and exit that residence in approximately the week prior to securing the search warrant. Id.

At this early stage, the evidence is fairly strong as to the gun charges in Counts Seventeen and Eighteen. When law enforcement arrested the defendant, they located in the residence where he has admitted staying for the

21

prior ten months the conversion switch charged in Count Seventeen and the two Glocks charged in Count Eighteen. Not only was the defendant found in the same residence with these guns, but law enforcement found several identifiers belonging to the defendant.

The defendant implies that there is little evidence connecting him with the drug conspiracy charged in Count One or the communication facility conspiracy in Count Two; presumably he believes the evidence linking the guns found in the North 60th Street address to any drug dealing also is weak. The evidence the government has proffered on these counts is less cut-and-dried than the evidence on the substantive drug count or the gun possession counts, but the government has proffered evidence that the phone number used to set up what eventually would become the October 2023 fentanyl controlled buy made by the defendant was one of the shared customer numbers used by other alleged members of the DTO.

The weight of the evidence weighs in favor of a conclusion that the defendant presents a danger to the community.

3. *The History and Characteristics of the Person*

Much of the defendant's history and characteristics is more relevant to an evaluation of flight risk than dangerousness. Even facts more related to a flight risk analysis, however, may have some bearing on a dangerousness analysis.

Based on what the defendant told Pretrial Services and what he stated in his briefing, the defendant appears to have strong family and community ties. The defendant's sister provides him with part-time employment and Ms. Smith helps him financially and allows him to live with her and her children. But the defendant "identified three other members of this DTO as [his] own family

22

members in his Mirandized statement to police." Dkt. No. 83 at 18-19. The North 60th Street residence in which the defendant was arrested with loaded guns and a conversion switch was the residence that he shared—even if periodically—with Ms. Smith and her children. Having a supportive family and significant other do not appear to have deterred the defendant from personally selling a substantial amount of fentanyl to an undercover agent.

The criminal history reflected in the bond study is not the worst the court has seen. While it shows that the defendant's first arrest (for felony burglary) took place when he was eleven years old, he was not adjudicated or convicted until 2010, when he was twenty-one. Dkt. No. 26 at 2-3. The 2010 convictions were for misdemeanor disorderly conduct, misdemeanor battery and misdemeanor possession of cocaine. Id. at 3. The defendant did not accrue a felony conviction until 2012, at the age of 23, when he was convicted of possession with intent to deliver less than one gram of cocaine as a party to a crime. Id. Of the defendant's five convictions since turning eighteen, only two of the five occurred within the last ten years. Id. at 4. Three of the five convictions reflected in the study were for misdemeanor offenses, with only two felony convictions: the 2012 cocaine charge for which he was sentenced in 2014 and a 2017 felony fleeing/eluding an officer charge for which he was convicted in 2018. Id. at 4-5. At best, this history shows a history of minor drug offenses.

In its opposition to the defendant's motion for bond review, however, the government provides more detail. The government asserts that in the first 2010 case—Milwaukee County Case No. 2010CF4473—the defendant was released on a $2,000 cash bond on September 11, 2010, but that "within a few months, he had reoffended while on bail and picked up new charges." Dkt. No. 83 at 16. Presumably the government is referencing the second 2010 arrest—the

defendant's November 13, 2010 arrest in 2010CM6843 for misdemeanor possession of cocaine and misdemeanor bail jumping. Dkt. No. 26 at 4. The government asserts that in *that* case, the defendant posted $500 cash bail on November 22, 2010 (about ten days after his arrest). Dkt. No. 83 at 16-17. Presumably the government's point is that the defendant was able to come up with $2,500 cash bail for two cases in just over two months. The government says that in the 2012 case (Milwaukee County Case No. 2012CF4612), the defendant was released on a signature bond on September 18, 2012, but violated the conditions of his release by November 26, 2012. Id. at 17. (The bond study does not indicate what this violation was.) The government recounts similar patterns for the 2016 misdemeanor conviction for operating while revoked and the 2017 felony fleeing/eluding charge—release, followed by new offenses, and obstructive/evasive behavior with law enforcement. Id. at 17-18. As for the defendant's 2018 case, the government recounts:

> The court ordered [the defendant] to report to jail to serve his sentence in case 17CF4084 on February 7, 2018, but he did not appear. He was originally charged with the felony offense of failing to Report to County Jail (10+ Days), which was amended to a misdemeanor Obstructing an Officer. The case was issued on an arrest warrant, but [the defendant] was not arrested for months and remained at-large/in warrant status until September 2018. He was ultimately ordered to pay a fine.

Id. at 18.

These additional details speak more directly to the risk that the defendant will not appear than to his dangerousness. That said, they show that losing money (cash bail) has not prevented the defendant from committing new crimes. They also show that the defendant has fled or resisted law enforcement on at least three occasions.

24

Also concerning is the fact that, at age thirty-four, the defendant appears to have little work history and relies on his sister and his girlfriend for financial support.[4] The defendant is not capable of supporting himself on the part-time work his sister provides, which means that he must have been supporting himself somehow. The defendant also has a history of drug use, including a long-term history of daily opioid use that required treatment with Suboxone. The defendant reports having curbed his heroin and pill use with the help of Suboxone, but this history, combined with the defendant's lack of substantial employment, raises concerns about the temptation to earn money through the drug trade if the defendant is out in the community.

The defendant's history and characteristics are a mixed bag, in several respects weighing in favor of a finding of dangerousness and in others weighing against.

      4.    *Nature and Seriousness of the Danger to Any Person or the Community That Would be Posed by the Person's Release*

This factor requires the court to determine whether the government has proved that the defendant poses a danger to any person or the community if released.[5] The court must consider the risk that the defendant "poses to the

---

[4] The defendant asserts that he "has always been employed." Dkt. No. 79 at 7. He says that he was employed at "both a cell phone store and his uncle's trucking company Trusted Care Transportation on North Mayfair Road, Wauwatosa, WI." Id. The defendant did not mention to Pretrial Services any job at a trucking company, and he told Pretrial Services that he was working part-time at his sister's phone store. Dkt. No. 26 at 2.

[5] In his reply brief, the defendant stated the following regarding this factor:

> [I]t should be stated that the government renames #3 under §3142(g) that does not exist, entitled 'The nature and seriousness of the danger to individuals and the community.' ECF #83 There is no such stand-alone umbrella factor; the government cites a subfactor of #3 above. 18 U.S.C. §3142(g) Nevertheless, we will address briefly as

25

community in the future, not simply the riskiness of his alleged offense."
United States v. Lewis, Case No. 23-3127, 2023 WL 4351244, at *1 (7th Cir.
July 5, 2023) (citing Dominguez, 783 F.2d at 706-07).

As the court detailed above, the nature and circumstances of the
defendant's charged offenses demonstrate that the defendant poses a risk to
the community. The defendant allegedly participated in an organization that
trafficked deadly drugs (fentanyl, meth and cocaine) and possessed firearms
(like those found at the defendant's residence) to further its drug trafficking,
and that it did so over an eighteen-month period. The government's description
of the lethal nature of fentanyl, and the impact it has had on the Milwaukee
community, is undisputed. Dkt. No. 83 at 14. The use of firearms in
furtherance of drug trafficking creates an increased risk of dangerous, as
evidenced by the fact that such an offense carries a presumption of detention.
These factors relate to the dangerousness the defendant posed when he was
engaged in the alleged offenses. The question is whether there is evidence
showing the likelihood of the defendant engaging in similar dangerous conduct
in the future.

The court already has observed that the evidence implies that the
defendant may have been supporting himself financially by engaging in drug
trafficking. He will need to support himself upon his release.[6] He has a history

---

this information has been stated previously in other documents and
it will not be exhaustive or address every subfactor of [the
defendant's] history and characteristics.

Dkt No. 85 at 4. Section 3142(g) lists four factors the court must consider; the
fourth is "the nature and seriousness of the danger to any person or the
community that would be posed by the person's release." 18 U.S.C. §3142(g)(4).
[6] The government notes that at least one co-conspirator remains at large and
that the suppliers of the drug trafficking organization have not been indicted.
Dkt. No. 83 at 11.

of opioid use and admitted having used heroin a week or so before his arrest. He now faces federal charges, some of which carry mandatory minimum penalties—a stressful circumstance for someone without full-time employment and with a substance abuse history. The court has observed that the detailed information the government provided regarding the defendant's criminal history shows that he has a history of committing new offenses while on release for previous ones, and a history of fleeing/attempting to obstruct/resisting when at risk of apprehension. With the past as a predictor for the future, this history constitutes evidence that the defendant is likely to reoffend if released and likely to be uncooperative with law enforcement if apprehended.

The evidence also implies that the defendant was using Ms. Smith's residence as his "place of business" by keeping firearms there. If so, he put Ms. Smith and her children at risk, an indicator that he is willing to engage in criminal conduct regardless of the risks it poses to people who love and support him.

Looking at all of the §3142(g) factors combined (and not relying solely on any one of those factors), the court concludes that the government has proven by clear and convincing evidence that the defendant poses a danger to the community.

E.  <u>Conditions That Will Reasonably Assure Appearance and Safety</u>

The government must prove not only that the defendant poses a danger to the community but also that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community[.]" 18 U.S.C. §3142(e). The defendant proposes conditions of release that he argues should reasonably assuage the court's concerns about the danger he may pose to the community. The court agrees with the government that no condition or

27

combination of conditions will reasonably assure the safety of any other person and the community.

Pretrial Services recommended several conditions to Judge Dries—having the defendant report to Pretrial Services as directed; prohibiting him from having contact with co-defendants, witnesses or victims; prohibiting him from possessing firearms; prohibiting him from possessing un-prescribed controlled substances; requiring him to participate in drug testing and treatment. Dkt. No. 26 at 5. The drug testing/treatment condition might reasonably address the court's concerns regarding the defendant's history of opioid use. But the other conditions would not address concerns about the likelihood of his reoffending. The defendant had a felony conviction at the time he was arrested in a residence with two loaded Glocks and a switch; it is not clear that a court order telling him not to possess firearms would reasonably assure his compliance. The same is true for a condition prohibiting him from possessing controlled substances; the testing/treatment condition might assure that he is not *using* the controlled substances but cannot ensure that he does not buy or sell them. Because it is not clear where the defendant obtained the fentanyl he sold to the undercover officer or the guns law enforcement found at the North 60th Street residence, there is no way to know whether a no-contact provision with co-defendants, witnesses or victims will address the danger of the defendant returning to the drug trade.

The court is unpersuaded that the additional conditions the defendant proposes (required employment, a third-party custodian and GPS monitoring/home confinement), dkt. no. 79 at 10-11, mitigates the court's concerns about the danger he poses. The defendant asserts that he was working at his uncle's trucking company before he was arrested and that that

28

job awaits him if released. Id. at 11-12. The government believes that the defendant's uncle has a prior criminal history (including a federal conviction) and points out that that uncle's residence is the one the defendant identified as his "permanent" residence and the one that shows up in the defendant's criminal history dating back fifteen years. Dkt. No. 83 at 19. Whether or not that is true, the fact that the defendant was employed at the time of his arrest did not prevent him from being in a residence with loaded guns and a switch. The defendant suggests that his uncle, someone named Rhonda McKinney, someone named Linda Love and someone named Shykela Holder, could be appointed third-party custodians for the defendant. Dkt. No. 79 at 9-10. The defendant provides limited information about his uncle and nothing about any of the other individuals other than their addresses—he does not explain his relationships with the three women, does not provide their work schedules (to allow the court to determine whether they would be present when the defendant is supposed to be at home) or even whether any of them have agreed to act as a third-party custodian. More to the point, it is not clear how any of these individuals would prevent the defendant from possessing guns or drugs. The defendant was living with Ms. Smith and her children at the time he was arrested, and there were loaded guns and a switch in that residence. Finally, the defendant suggests GPS monitoring, electronic monitoring or home confinement. Dkt. No. 79 at 10. These conditions are more relevant to ensuring that a defendant is not a risk of flight than to reasonably assuring the safety of the community. Home detention, in particular, is not a condition that would assure that the defendant would not engage in further criminal conduct. The evidence implies that the defendant was keeping firearms—firearms he was prohibited from possessing—in the place where he'd been living (whether off

29

and on or continually) at the time of his arrest. GPS monitoring would not prevent the defendant from selling or purchasing drugs or from possessing firearms, nor would location monitoring.

## IV.   Conclusion

The court **FINDS** that the defendant successfully rebutted the operative presumptions of detention. The court **CONCLUDES**, however, that the government has proved by clear and convincing evidence that the defendant poses a danger to others and the community.

The court **DENIES** the defendant's motion for release on bond with conditions. Dkt. No. 79.

Dated in Milwaukee, Wisconsin this 4th day of June, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

30